UNITED STATES of America, Plaintiff-Appellee,

v.

Vankirk MOORE and Harold Burnell, Defendants-Appellants.

Nos. 174 and 175, Dockets 77–1245 and 77–1246.

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1977.

Decided Jan. 12, 1978.

---

David Blackstone, New York City, for defendant-appellant Vankirk Moore.

Guy Miller Struve, New York City, for defendant-appellant Harold Burnell.

Eugene Neal Kaplan, Asst. U. S. Atty., Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., Jeffrey E. Livingston and Robert J. Jossen, Asst. U. S. Attys., New York City, of counsel), for plaintiff-appellee.

Before GURFEIN and VAN GRAAFEILAND, Circuit Judges, and COFFRIN, District Judge.*

COFFRIN, District Judge:

Vankirk Moore and Harold Burnell appeal from judgments of conviction entered in the United States District Court for the Southern District of New York following a thirteen day jury trial before the Honorable Vincent L. Broderick. Both Moore and Burnell were convicted on all four counts of an indictment charging them with crimes arising out of the December 1, 1976, kidnapping of Henry "Buster" Huggins, a narcotics dealer and the owner of the H & S Transmission Shop in the Bronx. Count I charged appellants with conspiracy to kidnap Huggins, in violation of 18 U.S.C. § 1201(c). Count II charged them with the actual kidnapping, in violation of 18 U.S.C. § 1201(a). Count III charged them with conspiracy to transmit in interstate commerce a communication containing a demand for ransom for Huggins' release. Count IV charged them with actually transmitting in interstate commerce such a ransom demand.[1]

In this appeal, both Moore and Burnell argue that the essential element of transportation in interstate or foreign commerce was never proved, and, therefore, federal jurisdiction did not exist. They claim both that there was insufficient evidence of any interstate or foreign transportation of Huggins and that the statutory presumption contained in 18 U.S.C. § 1201(b) that a kidnapped person who is not released within 24 hours has been transported in interstate or foreign commerce is unconstitutional. It is argued that, in view of the meager evidence of interstate transportation, the judge's instruction to the jury that it could find the interstate transportation element by using the § 1201(b) presumption was highly prejudicial error. Burnell also asserts that there was insufficient evidence that he transmitted or conspired to transmit in interstate commerce a demand for ransom for Huggins' release.

At about 7:45 P.M. on Wednesday, December 1, 1976, Buster Huggins walked out of the apartment of his girlfriend, Janet

---

* Honorable Albert W. Coffrin of the United States District Court for the District of Vermont, sitting by designation.

1. On April 22, 1977, appellants were each sentenced to life imprisonment on Count II, ten years imprisonment on Count I, and five years imprisonment on Counts III and IV, the sentences on all counts to run concurrently.

Lee, at 1818 Anthony Avenue in the Bronx and has never been seen or heard from again. A few moments earlier he had been speaking on Miss Lee's telephone to Harold Burnell, one of his employees at H & S Transmission, who lived on a lower floor in the same apartment building as Miss Lee. According to Lee, Huggins told Burnell on the telephone that he was on his way downstairs. After asking Lee for Burnell's apartment number, Huggins walked with her to the elevator, told her he would be back in ten or fifteen minutes, and left.

Ten minutes after Huggins left Lee's apartment, Burnell arrived there to inquire about Huggins' whereabouts and claimed that Huggins had not shown up at his apartment. Lee told Burnell that Huggins had left to see him about ten minutes earlier. After another ten minutes had passed, Burnell called Lee over the building intercom and told her that he still had not seen Huggins but that Huggins' car was in front of the building. About five minutes later, Burnell called Lee again and told her that he had not seen Huggins, but that now his car was gone. The Government characterizes this series of conversations as an attempt by Burnell to establish an alibi through Lee. In light of the overwhelming evidence summarized below that it was Moore and Burnell who abducted Huggins, this appears to be the most plausible explanation for Burnell's numerous communications with Lee during the period immediately following Huggins' departure from her apartment.

Huggins' disappearance on December 1, 1976, during what was supposed to have been a ten or fifteen minute meeting with Burnell would not, of course, necessarily implicate Burnell. However, certain of Burnell's conversations in November, 1976, are significantly incriminatory. Burnell first spoke to one Kissoon "Kojak" Adams, a friend of both Moore and Burnell, and asked Adams if he wanted to participate in the kidnapping of Huggins for a $25,000

share of the ransom. Adams declined the invitation. On November 7 or 8, 1976, Burnell discussed the kidnapping plan with his girlfriend, Mary Burch. He said that Moore was planning to "rip Huggins off because Huggins had ripped off three Rastafarians," Trial Transcript at 347–48,[2] and that only Moore, Adams and he knew of the plot they would follow in doing it. Burnell claimed that he would not have anything to do with the actual kidnapping but would go to work every day as usual. He told Burch that "they would hold Buster for money," id. at 348; they would divide the money; and they would probably take Huggins "out of the states where he would never be found." Id. at 349. However, he did not say to whom the word "they" referred. Id.

Between 9:30 and 10:00 P.M. on December 1, 1977, two ransom demands were made by Huggins' kidnappers. A call was made to Huggins' parents in South Carolina and was answered by Huggins' sixteen-year-old brother, Ira. The male caller asked to speak to Ira's father. When Ira Huggins said that his father was not in, the man asked to speak to his mother. After his mother picked up an extension phone, Ira continued to listen while the caller told Mrs. Huggins that her son had been kidnapped and that he was asking for a quarter of a million dollars if she wanted to see her son alive again. The caller then put Buster Huggins on the phone and he said, "Mom, do what these men say." Id. at 887.

One kidnapper also telephoned the home of Martha Wigfall, a woman with whom Buster Huggins had been living for about three years. Her brother, Mark, answered the telephone and was told to tell Martha "we have Buster" and "he owes us $250,-000." Id. at 230. The caller also told Mark that Martha and Buster Huggins' father were to meet the kidnappers at the transmission shop, and that if Martha and Mr. Huggins, Sr. were followed by the police, Buster would be killed.

---

2. Rastafarians are a vegetarian sect who eat no eggs or meat and do not cut or wash their hair, but leave it in "dreadlocks." Trial Transcript at 597. In Burch's testimony, Moore is referred to as "Tico".

At approximately 6:30 A.M. on December 2, 1976, Martha Wigfall was called by a man ("the first caller") who told her to come with Mr. Huggins, Sr. and to bring $250,000 to the H & S shop at 4:00 P.M. on Friday, December 3. When Wigfall asked to speak to Buster, she was told that he had already spoken to his mother the previous night.

That afternoon the FBI entered the case, and with Wigfall's consent, placed a recording device on her phone. Based on an identification of Burnell's voice by Huggins' brother Ricky, who had listened in on the 6:30 A.M. call, FBI agents visited Burnell's apartment looking for Huggins at about 5:30 P.M. Upon entering Burnell's apartment on a ruse, the agents saw and spoke with Burnell for about three minutes, but did not see Huggins. They also observed Burnell's car, a 1968 brown Buick Wildcat with South Carolina license plates bearing the numbers NMV–109. The car matched a description given the agents by Ricky Huggins.

At about 1:35 A.M. on Friday, December 3, 1976, Mark Wigfall received another call at his sister's apartment. The caller was the same person who had spoken to Mark earlier. The caller stated that Martha Wigfall was to bring the money to the garage at 4:00 P.M. in a paper bag.

That afternoon at about 4:00 P.M., Martha Wigfall and Samuel Huggins, another of Buster's brothers, went to the H & S Transmission Shop. At the shop, Wigfall received another call from the first caller. She told him that she had $50,000; he reluctantly gave her 24 hours to be at the same place with the balance.

At about 11:30 that evening, Wigfall received a call at her apartment from another man ("the second caller"), who identified himself as "Buster's boss." *Id.* at 141. The conversation was somewhat longer than the previous calls, and included a statement by the caller that he and his accomplice were "get[ting] ready to take the M—F— out of town." *Id.* at 142. Wigfall asked to speak to Huggins, but was told that Huggins had already spoken to his mother on Wednesday night.

On the afternoon of Saturday, December 4, 1976, Martha Wigfall and Samuel Huggins, accompanied by FBI agents, returned to the H & S Transmission Shop. After the FBI had placed a recording device on the telephone there, Wigfall received three telephone calls from Huggins' kidnappers. First, the first caller of the previous afternoon telephoned and asked how much money she had, to which she replied she had only about $100,000. The caller said that "his boss" would call her back in about ten minutes. A few moments later, the second caller telephoned and told her Huggins was worth more than $100,000 and warned her that if she had been followed, they would "call it off." *Id.* at 148. Finally, Wigfall received another call from the first caller, who instructed her to go to the pay telephones in a parking lot alongside Nathan's Restaurant opposite the Korvette's Shopping Center on White Plains Road in the Bronx, and to answer the telephone in about twenty minutes.

Miss Wigfall and Samuel Huggins then drove to the designated parking lot and waited. When the telephone rang, she answered and found herself speaking to the second caller. He instructed her to take the money to the Rocky Point Lookout on the Palisades Parkway in New Jersey, where she would find three garbage cans. She was to place the money in the center can and then return to the same telephone to receive instructions on where to find Huggins.

Meanwhile, two FBI agents were driving through the Korvette parking lot, looking for a place to stop and observe the telephone booths. While there they saw two people driving Burnell's brown Buick Wildcat. The car stopped near the Korvette's store and the passenger, later identified as appellant Moore, made a call at 5:32 P.M., exactly the same time that Martha Wigfall received the call in the telephone booth at Nathan's.

The FBI then arrested the two men who had been in Burnell's car. Moore first identified himself as his brother, Lennox, and

denied knowing Buster Huggins or his whereabouts. He was given a pat-down search which turned up a washcloth, the keys to a canvas bag containing a revolver found in Burnell's car, and two business cards. One of the cards had written on it the number of one of the telephones located inside Nathan's. The other, which Moore tried unsuccessfully to destroy enroute to FBI headquarters, contained the numbers of both the telephones outside of Nathan's. Burnell identified himself and told the agents only that he knew Huggins but had last seen him on the afternoon of December 1 at the H & S Transmission Shop.

On December 23, 1976, Huggins' car was discovered in a long-term parking lot at the John F. Kennedy Airport. The keys had already been recovered from Moore's apartment by FBI agents on December 4.

## I.

Section 1201(a)(1) of 18 U.S.C. reads as follows:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

(1) the person is willfully transported in interstate or foreign commerce;

&ast; &ast; &ast; &ast; &ast; &ast;

shall be punished by imprisonment for any term of years or for life.

For kidnapping to become a federal offense, the operative condition of § 1201(a)(1) is, of course, that the person be "willfully transported in interstate or foreign commerce." The "interstate nexus," as the parties here have denominated this jurisdictional element of the offense, is necessary both for the initiation of FBI investigation and for the jurisdiction of the federal courts. In order to facilitate a finding of federal jurisdiction, Congress added to § 1201 a rebuttable presumption of interstate or foreign transportation:

(b) With respect to subsection (a)(1), above, the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce.

18 U.S.C. § 1201(b).

■ In the trial below, the Government's attempt to prove the interstate or foreign transportation of Buster Huggins by Moore and Burnell was frustrated by a lack of probative evidence. Its only proof of this crucial jurisdictional element consisted of several circumstances which only very tenuously supported the conclusion sought to be proved. It is argued first that the geographic proximity of the Bronx to New Jersey via the George Washington Bridge is a factor tending to suggest interstate transportation. Even if we assume that Moore and/or Burnell had to have crossed the Hudson River in order to reconnoiter the Lookout Point on the Palisades Parkway and choose the garbage can ransom drop-off point, there is no logical reason to conclude that Huggins was taken with them or, indeed, that they went there while the kidnapping was in progress.

The Government also contends that Burnell's statements to Mary Burch in November, 1976, that Moore "would have somebody take [Huggins] out of the states" and "he would never be found," Trial Transcript at 510, were declarations of an intent which was later carried out. Considered in light of Moore's later statement to Martha Wigfall that he was "getting ready to take [Huggins] out of town" id. at 142, these statements are urged upon us as having special significance.

Judge Broderick admitted the evidence of Burnell's statements to Burch under Fed.R. Evid. 801(d)(2)(E) as the statement of a conspirator made in furtherance of the conspiracy, and, on the authority of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), as a statement of intent admitted to show that the intended act was subsequently performed.

Both appellants forcefully argue that these statements were inadmissible.[3]

■ However, we need not re-examine Judge Broderick's decision to admit these statements because we find that, even if they were properly admitted, they are not sufficient by themselves to prove that any *actual* interstate transportation of Buster Huggins ever occurred. Burnell's words conveyed only the most general idea that Moore and some unnamed third person intended to transport Huggins in interstate or foreign commerce. The suggestion that Huggins would be taken out of the states is also not consistent with the theory advanced by the Government in its brief that other evidence suggests Huggins was transported to New Jersey. Conceivably, had the Government been able to present additional, more concrete evidence of interstate or foreign transportation, Burnell's statements of intent to Burch might have been more probative of the fact that the intent was actually carried out. In the circumstances of this case, however, these statements, even if properly admitted, are insufficient to prove that Huggins was in fact transported out of the State of New York.

■ The Government further contends that the fact that Huggins was not allowed to speak to Wigfall during the ransom demand telephone calls proves by inference that the victim was not with the caller when the calls were made. It is obvious that no such inference can be assumed, and even if the refusal to allow Huggins to speak to Wigfall suggested that Huggins

was not present when the ransom calls were made, it hardly suggests that he was not within the State of New York.[4]

Because of the paucity of evidence tending to prove that Huggins was transported in interstate or foreign commerce, the presumption embodied in § 1201(b) becomes highly significant. With the use of that presumption, the jury could find the requisite interstate or foreign transportation simply by finding only the obvious fact that Huggins was not released within 24 hours.

Following the Government's request to charge which had been served on the court and opposing counsel five days before the trial began, the court instructed the jury that it could rely on the statutory presumption of 18 U.S.C. § 1201(b) that a kidnapped person who has not been released within 24 hours has been transported in interstate or foreign commerce. The court was careful to point out that the presumption was rebuttable. Judge Broderick's exact words were as follows:

> Under the law, the failure to release a kidnapping victim within 24 hours creates a presumption that the victim has been transported in interstate or foreign commerce, and you may so find. You are not required to so find. This presumption is not conclusive, and it may be refuted or disproved by contrary evidence, and it may simply not be accepted by you as jurors.
>
> In sum, you are to look at all the evidence in this case, not only the presump-

---

3. Burnell contends that Fed.R.Evid. 803(3) was approved by Congress with the understanding that it be construed to limit the *Hillmon* rule to render statements of intent by a declarant admissible only to prove *his* future conduct, not that of a third person. *See* H.R.Rep.No.93–650, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Admin.News, pp. 7075, 7087. As the Government points out, however, the Advisory Committee Note to Rule 803(3) left the *Hillmon* doctrine "undisturbed," and the courts have held that *Hillmon* declarations of intent are admissible as evidence of actions of the declarant and others. *See United States v. Stanchich*, 550 F.2d 1294, 1297–98 n.1 (2d Cir. 1977); *United States v. Pheaster*, 544 F.2d 353, 379–80 (9th Cir. 1976), *cert. denied sub nom.*

*Inciso v. United States*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977).

4. The weakness of the Government's evidence of any interstate or foreign transportation of Buster Huggins is demonstrated most convincingly by the far-fetched inferences they ask this Court to draw from insignificant facts. In addition to the arguments discussed in the text, the Government argues in a footnote that the kidnappers' demand that Huggins' father travel to New York from South Carolina was a "displayed indifference to state boundaries" entitling the jury to infer that the kidnappers were similarly willing to cross state borders. Brief for Appellee at 42. Such a non sequitur demands no rebuttal.

tion that I just mentioned to you but the entirety of the proof before you and decide whether or not the government has proved beyond a reasonable doubt that Buster Huggins was in fact transported in interstate or foreign commerce.

Trial Transcript at 2014.

Appellants now for the first time attack the constitutionality of the § 1201(b) presumption and argue that its inclusion in the charge constituted plain error affecting substantial rights and seriously affecting the fairness of the proceedings. Before considering what effect appellants' failure to raise this claim below should have, we first address the question of the constitutionality of the presumption itself.

The federal Kidnapping Act, ch. 271, 47 Stat. 326 (1932), popularly known as the "Lindbergh Law," was enacted in 1932 to stem a rising tide of organized kidnapping which captured great public attention after the famous Lindbergh kidnapping case. The backdrop of this legislation was vividly described by the Supreme Court in *Chatwin v. United States*, 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946):

> Kidnapping by that time had become an epidemic in the United States. Ruthless criminal bands utilized every known legal and scientific means to achieve their aims and to protect themselves. Victims were selected from among the wealthy with great care and study. Details of the seizures and detentions were fully and meticulously worked out in advance. Ransom was the usual motive. "Law enforcement authorities, lacking coordination, with no uniform system of intercommunication and restricted in authority to activities in their own jurisdiction, found themselves laughed at by criminals bound by no such inhibitions or restrictions. . . . The procedure was simple—a man would be kidnapped in one State and whisked into another, and still another, his captors knowing full well that the police in the jurisdiction where the crime was committed had no authority as far as the State of confinement and concealment was concerned." Fisher and

McGuire, "Kidnapping and the So-called Lindbergh Law," 12 New York U.L.Q. Rev. 646, 653.

326 U.S. at 462–63, 66 S.Ct. at 237.

As the Court pointed out in *Chatwin*, the need for a federal statute arose from the kidnappers' successful evasion of law enforcement authorities by merely crossing state lines. By authorizing federal investigation and prosecution for kidnapping, Congress eliminated the kidnappers' artificial geographic refuge.

The original federal statute did not contain a presumption like that contained in § 1201(b). In amendments to the statute passed in 1934, Congress provided that failure to release a kidnapping victim within seven days would create a presumption of interstate or foreign transportation. Kidnapping Act, ch. 301, 48 Stat. 781 (1934). While the Department of Justice had submitted a report suggesting a three day period before the presumption became operative, the House of Representatives changed that period to seven days. The House Report relating to the amendment explains the presumption:

> Secondly, a provision is added to the effect that the failure to release the kidnapped person within 7 days after such kidnapping shall create a presumption that the person has been transported in interstate or foreign commerce. Such presumption is not conclusive, however.

> The purpose of this provision is to clear up borderline cases, justifying Federal investigation in most of such cases and assuring the validity of Federal prosecution in numerous instances in which such prosecution would be questionable under the present form of this act. The legality of such a presumption would seem to be fairly within the rule established by the United States Supreme Court in *Mobile [, Jackson & Kansas City] Railroad Co. v. Turnipseed*, (219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78 [1910]).

> That a legislative presumption of one fact from evidence of another may not constitute a denial of due process or a denial of the equal protection of the

!aw, it is only essential that there shall be some rational connection between the fact proved and the fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.

H.R.Rep.No.1457, 73d Cong., 2d Sess. 2 (1934).

In 1956 Congress amended the § 1201(b) presumption to reduce the period required without release from seven days to 24 hours. Act of August 6, 1956, ch. 971, 70 Stat. 1043. The purpose of the amendment was "to authorize the Federal Bureau of Investigation to initiate investigations of any kidnapping in which the victim has not been released within 24 hours after his seizure." H.R.Rep.No.2763, 84th Cong., 2d Sess. 1 (1956); S.Rep.No.2820, 84th Cong., 2d Sess. 1 (1956), U.S.Code Cong. & Admin. News, p. 4373. This was the same purpose that Congress attributed to the 1934 amendment. *Id.* at 2.

Without referring to any factual data upon which the logical validity of the presumption could be based, both Committees on the Judiciary emphasized repeatedly in their reports that the purpose of the shortened period after which the presumption would take effect was to allow the FBI, with "[its] worldwide reputation . . . for the apprehension and conviction of kidnapers" to initiate its investigation. H.R. Rep.2763, *supra*, at 3; S.Rep.2820, *supra*, at 2, U.S.Code Cong. & Admin.News 1956, p. 4375. There can be no question that this was the predominant reason for the amendment. Although Burnell and the Government have argued the question of what the meager empirical data underlying the presumption means, their arguments lack force. It is apparent that virtually no empirical data of any significance which supports the validity of the presumption was presented to Congress.

That lack of data is not altogether surprising, however. Congress clearly was primarily interested in expediting FBI investigation in kidnapping cases in order to apprehend the criminal and save the victim's life.[5] To achieve that objective Congress created the § 1201(b) presumption under the commerce clause. Had Congress's *pri-*

---

**5.** In 1973, Representative Edwin B. Forsythe introduced H.R.8722 to amend § 1201 by adding the following subsection:

(D) The failure of a person, who voluntarily agrees to travel with another to a particular destination, to arrive at that destination after 'a reasonable period of time from the commencement of such travel, shall create a rebuttable presumption that the person so voluntarily agreeing to travel has been decoyed or inveigled under subsection (a).

Testifying in support of that bill before the Subcommittee on Crime of the House Judiciary Committee, Rep. Forsythe, in addressing the question of the constitutionality of his bill, alluded to the § 1201(b) presumption:

It may also be stated that H.R.8722 rests on questionable constitutional grounds. Some people have indeed argued that the bill creates a presumption that a kidnaping has occurred, thus shifting the burden of proof to the defendant and creating a situation of guilty until proven innocent.

I do not believe this contention withstands careful analysis. In the first instance, H.R. 8722 does not seek to create an evidentiary presumption that kidnaping has occurred. H.R.8722 seeks only to create a rebuttable presumption of inveiglement or decoying *for the purposes of investigation only.*

Just as the *legislative history of the 24-hour presumption makes it clear that the principal purpose of the presumption was investigatory not evidentiary,* so, too, it should be made clear that H.R.8722 is for investigatory purposes only.

In the second place, as a practical matter, it is somewhat unlikely that a prosecuting attorney, in the *Karen Levy* case, for example, would rest his case on the argument that a person charged with kidnaping is guilty solely because it is presumed the victim was decoyed and was last seen with the accused. *I rather suspect that any prosecuting attorney who expects the jury to return a verdict of guilty will base his case on the facts rather than investigatory presumptions.*

Nevertheless, to clarify this point, I would recommend that a new section be added to H.R.8722. The purpose of the section is to state that the presumption created by this legislation is exclusively for investigatory purpose and in no way represents evidentiary assumption.

*Hearings on H.R.4191 and 8722 Before the Subcommittee on Crime of the House Committee on the Judiciary,* 93d Cong., 2d Sess. 39 (1973) (emphasis added).

*mary* purpose been to give the federal court jurisdiction over a particular crime, it is highly likely that it would have searched for a more solid empirical basis for the § 1201(b) presumption.

The seminal case on the constitutionality of statutory presumptions in the trial of criminal cases is *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). In *Tot*, the Court held unconstitutional a provision of the Federal Firearms Act, ch. 850, § 2(f), 52 Stat. 1250 (1938) (repealed 1968), which provided that the possession of a firearm or ammunition by a person "who has been convicted of a crime of violence or is a fugitive from justice" was "presumptive evidence that such firearm or ammunition was shipped or transported or received" in interstate or foreign commerce. Under its previous decisions, the Court said, a statutory presumption could not be sustained "if there [were] no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other [was] arbitrary because of lack of connection between the two in common experience." *Id.* at 467–68, 63 S.Ct. at 1245 (footnote omitted). To hold otherwise, the Court went on, would impermissibly "shift the burden by arbitrarily making one fact, which has no relevance to guilt of the offense, the occasion of casting on the defendant the obligation of exculpation." *Id.* at 469, 63 S.Ct. at 1246.

In 1965, the Supreme Court rendered two decisions restating and applying the test it had enunciated in *Tot*. In *United States v. Gainey*, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965), the Court upheld the presumption contained in 26 U.S.C. § 5601(b)(2) (amended in 1976) that the accused's presence at an illegal still is sufficient evidence to authorize conviction for carrying on the business of distilling without the required bond. Stating that the *Tot* test was the correct test to apply, the Court continued: "The process of making the determination of rationality is, by its nature, highly empir-

ical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it." 380 U.S. at 67, 85 S.Ct. at 757.

In *United States v. Romano*, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965), the Court considered the constitutionality of the presumption in 26 U.S.C. § 5601(b)(1) (amended in 1976)[6] that the accused's presence at the site of an illegal still could be deemed sufficient evidence to authorize conviction for possession, custody or control of the still. The Court held the presumption unconstitutional and cited the rule in *Tot* : " '[W]here the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them, it is not competent for the legislature to create it as a rule governing the procedure of courts.' " 382 U.S. at 139, 86 S.Ct. at 281 (quoting *Tot v. United States*, 319 U.S. 463, 468, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943)). Having stated that the offense of possession, custody or control of a still "has a much narrower coverage than    .   .   . [a] sweeping prohibition of carrying on a distilling business," *id.* at 140, 86 S.Ct. at 282, the Court went on to say: "Presence is relevant and admissible evidence in a trial on a possession charge; but absent some showing of the defendant's function at the still, its connection with possession is too tenuous to permit a reasonable inference of guilt   .   .   .." *Id.* at 141, 86 S.Ct. at 282.

In *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Supreme Court once again examined a criminal statutory presumption. *Leary* was charged with transporting marihuana knowing it to have been brought into the United States contrary to law—a violation of the Narcotic Drugs Import and Export Act § 2(h), 70 Stat. 570 (1956) (repealed 1970). The same subsection also provided:

Whenever on trial for a violation of this subsection, the defendant is shown to

6. The constitutionality of § 5601(b)(1) was challenged in *Gainey*, but the Court found it unnecessary to decide the issue there.

have or to have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury.

Reviewing the *Tot, Gainey* and *Romano* line of cases, the Court referred to the test used in those cases simply as the " 'rational connection' standard announced in *Tot*." *Leary v. United States,* 395 U.S. at 35, 89 S.Ct. at 1547. The Court then concluded:

> The upshot of *Tot, Gainey* and *Romano* is, we think, that a criminal statutory presumption must be regarded as "irrational" or "arbitrary," and hence unconstitutional, unless it can at least be said with substantial assurance *that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.* And in the judicial assessment the congressional determination favoring the particular presumption must, of course, weigh heavily.

*Id.* at 36, 89 S.Ct. at 1548 (footnote omitted; emphasis added). After finding there was little direct evidence as to the beliefs of marihuana smokers generally about the source of their marihuana, the Court undertook an exhaustive survey of data concerning the proportion of domestically consumed marihuana that is of foreign origin. Finding that the data did not establish that marihuana smokers "more likely than not"

knew their marihuana was imported, the Court held unconstitutional the presumption that mere possession was sufficient evidence of culpable knowledge.

▇ Applying the Supreme Court's "rational connection" test derived from *Tot* and its progeny and refined by *Leary's* "more likely than not" standard, we cannot escape the conclusion that the presumption of interstate transportation embodied in 18 U.S.C. § 1201(b) is unconstitutional when used to prove an element of the federal crime of kidnapping. There is virtually no empirical data for concluding that a kidnapping victim has been transported in interstate or foreign commerce if he has not been released within 24 hours of his disappearance.[7] Furthermore, as we have already noted, the presumption was enacted primarily to allow the FBI to apply its investigative resources and expertise to kidnapping cases as early as possible. It was not necessarily enacted to "confirm what folklore teaches," *United States v. Gainey,* 380 U.S. at 67, 85 S.Ct. 754, or to codify what we know from "common experience," *Tot v. United States,* 319 U.S. at 468, 63 S.Ct. 1241. We simply cannot say with substantial assurance that for purposes of proving the transportation of a kidnapping victim in interstate or foreign commerce such transportation is more likely than not to have occurred whenever the victim is not released within 24 hours of his disappear-

---

7. The statistic that engendered the most debate in this case supports, if anything, the proposition contrary to that in § 1201(b). The Government points out that the FBI statistics reveal that of the 1,615 kidnapping cases investigated by the FBI in calendar year 1973, only 146 cases were prosecuted in state court due to lack of federal jurisdiction. The Government fallaciously argues that "the clear impact of these figures is that in substantially more than a majority of the cases investigated by the FBI the interstate nexus actually was satisfied." Brief for Appellee at 35.

Appellant Burnell responds to the Government's use of this statistic by demonstrating that the relevant statistic to be compared to the 146 cases prosecuted in state courts is the number of cases actually prosecuted in federal courts. Reports of the Administrative Office of the United States Courts reveal that for each of the fiscal years 1969–1976, substantially fewer

than 146 kidnapping prosecutions commenced in the United States courts. The figures are as follows:

| Fiscal Year | Kidnapping prosecutions commenced |
|---|---|
| 1969 | 65 |
| 1970 | 75 |
| 1971 | 84 |
| 1972 | 122 |
| 1973 | 98 |
| 1974 | 127 |
| 1975 | 134 |
| 1976 | 75 |

1972 Report of the Director of the Administrative Office of the United States Courts 365 (Gov't Printing Off. ed.); 1976 *id.* at 374.

The significance of these statistics in the determination of the validity of the § 1201(b) presumption from the standpoint of common experience is admittedly not great.

ance.[8] *Leary v. United States,* 395 U.S. at 36, 89 S.Ct. 1532; *cf. Allen v. County Court, Ulster County,* 568 F.2d 998 (2d Cir. 1977) (statutory presumption that presence in an automobile of a weapon is presumptive evidence that persons in the automobile possess that weapon is unconstitutional).

■ Because the evidentiary presumption of interstate transportation in 18 U.S.C. § 1201(b) is unconstitutional, its application in this kidnapping case deprived appellants of due process of law. However, before this Court can reverse the kidnapping charges on this ground, we must determine whether appellants failed to contest the issue below and, if so, whether that failure constituted a waiver of their right to raise it here.

The Government contends that both Moore and Burnell failed to challenge the constitutionality of the § 1201(b) presumption in the district court and that they completely neglected to object to Judge Broderick's charge on this point. These failures to object below, it is urged, constitute a waiver which bars appellants from raising the issues on appeal. *See United States v. Braunig,* 553 F.2d 777, 780 (2d Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977). The Government also argues that the appellants made a tactical decision not to raise the issues before the federal trial court. The Government suggests that appellants did not want to be tried in state court, where they faced *mandatory minimum sentences* if convicted of kidnapping. The Government also suggests that appellants gambled on an acquittal knowing that if they lost at trial and won the appeal on the constitutional issue they would have heard all the evidence against them.

Both appellants virtually concede that they failed to challenge the constitutionality of § 1201(b) below and admit that they took no exception to that portion of the court's charge dealing with § 1201(b).[9] Appellants do argue through their present counsel that they made no conscious tactical decision not to raise the issues before the trial court.[10] They point out that insofar as

8. Since we find the § 1201(b) presumption is unconstitutional under this standard, we do not reach the question of whether a criminal presumption must satisfy a "reasonable doubt" standard. *See Leary v. United States,* 395 U.S. 6, 36 n. 64, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); *see also Barnes v. United States,* 412 U.S. 837, 842–46, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *Turner v. United States,* 396 U.S. 398, 419–24, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).

9. Both appellants are represented by counsel on appeal who did not represent them at trial.

10. After the Government became aware that appellants were raising the question of the constitutionality of the § 1201(b) presumption on appeal, it moved in the district court to supplement the record of the case on appeal pursuant to Fed.R.App.P. 10(e). The supplementary material consisted of affidavits of the attorneys who represented the Government at trial wherein the attorneys claimed that they had been told by defendants' trial counsel that they had made a tactical decision not to question the § 1201(b) presumption or the possibility of a lack of federal jurisdiction at trial. After responsive affidavits were filed, Judge Broderick denied the motion in a Memorandum Order dated August 5, 1977, stating:

It would be inappropriate to add materials with respect to those thought processes to the record at this point, since all my legal rulings (and certainly all of the jury's factual determinations) were made without benefit of knowledge of those processes.

The Government thereupon attempted an end-run around Judge Broderick's explicit ruling that the affidavits could not be included in the record by referring in its brief to this Court to the very material Judge Broderick excluded. Concerned that only the Government's side of this issue would be before us, appellant Burnell then carried this unwarranted circumvention of the trial judge's order one step further by including as an appendix to his reply brief all the affidavits which Judge Broderick ruled could not supplement the record. While we are aware of the positions both sides attempted to expound in those affidavits, we have not considered the affidavits in reaching our decision in this case. Counsels' attempts to bring before us matters which were not of record below and which the trial judge specifically declined to add to the record were highly improper and should not be repeated.

We note also that the Government's post-oral argument letter of September 15, 1977, regarding the Bronx District Attorney's decision not to prosecute Moore and Burnell for kidnapping is also not properly before the Court. The statements made therein have no bearing on the issues raised in this appeal, and we have not considered them in reaching our decision.

the overall insufficiency of evidence of any interstate or foreign transportation of Huggins is concerned, their objections were preserved by the Fed.R.Crim.P. 29 motions. It is not seriously suggested, however, that the Rule 29 motions were satisfactory substitutes for the requisite objection to the charge.

We note, furthermore, that appellants had received copies of the Government's request to charge at least a week before the judge charged the jury. They should have been apprised then of the constitutional issues, for in its requests the Government referred to a section of Devitt and Blackmar's handbook, *Federal Jury Practice and Instructions*, where the constitutionality of § 1201(b) as applied to the jury charge is questioned.[11] On the record properly before us there is insufficient evidence to conclude that the constitutional issues were intentionally not raised before the trial court. It is apparent, however, that appellants failed effectively to raise the constitutionality of § 1201(b) and neglected to take exception to the relevant portion of the charge to the jury.

Anticipating that we would be loathe to overlook the failure to raise the § 1201(b) question below, appellants' present counsel urge us to exercise our discretionary power to notice plain error in the charging of the § 1201(b) presumption. While the power to notice plain error is discretionary and is exercised sparingly for very sound reasons, we are of the opinion that this case requires us to do so.

■ Rule 52(b) of Fed.R.Crim.P. provides: "(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The fact that an error is of constitutional dimension, however, does not necessarily raise it to the level of plain error which we will notice pursuant to Fed.R.Crim.P. 52(b). "Federal courts, including the Supreme Court, have declined to notice errors not objected to below even though such errors involve a criminal defendant's constitutional rights." *United States v. Indiviglio*, 352 F.2d 276, 280 (2d Cir. 1965) (en banc), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); *see, e. g., Estelle v. Williams*, 425 U.S. 501, 512, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Stein v. New York*, 346 U.S. 156, 174 n.17, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), *overruled in part by Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *United States v. Ballou*, 348 F.2d 467 (2d Cir. 1965); *United States v. Sten*, 342 F.2d 491 (2d Cir.), *cert. denied*, 382 U.S. 854, 86 S.Ct. 103, 15 L.Ed.2d 91 (1965); *cf. Chapman v. California*, 386 U.S. 18, 21–22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (Supreme Court declined to rule that all federal constitutional errors be deemed harmful).

On the other hand, "[t]he plain error doctrine recognizes the need to mitigate in criminal cases the harsh effects of a rigid application of the adversary method of trial, whereby the attorney's conduct binds his client." 8B *Moore's Federal Practice* ¶ 52.-02[2], at 52–4 (2d ed. 1977). This Court has applied the doctrine in a number of instances when counsel failed to object below. It has been invoked where the trial court failed to instruct the jury that they could consider both a defendant's partial denial of a conspiracy count and a defense of entrapment to that count, *United States v. Brown*, 544 F.2d 1155, 1159 (2d Cir. 1976); where the court gave a "natural and probable consequences" charge, *United States v. Robinson*, 545 F.2d 301, 306 (2d Cir. 1976);

11. No case has been found containing a discussion of the presumption of interstate transportation arising out of failure to release within 24 hours. If there is other evidence of interstate transportation it is probably prudent not to charge the jury in terms of a statutory presumption or inference. The statute states that the presumption is rebuttable. Whether it is effective or not depends on whether a rational connection appears.

See *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). The usual function of the presumption is to permit the federal authorities to enter the case and investigate.

2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 43.07, at 256 (3d ed. 1977). The Government did not, however, include the above-quoted text in its request to charge.

where the court failed to charge accurately each and every element of the offense, *United States v. Howard*, 506 F.2d 1131, 1134 (2d Cir. 1974); *United States v. Fields*, 466 F.2d 119, 121 (2d Cir. 1972); where the charge as a whole had the effect of removing an essential element of the offense from the jury's consideration, *United States v. Singleton*, 532 F.2d 199, 207 (2d Cir. 1976); and where the charge as a whole was so defective and deficient that the guidance given the jury did not enable it to fulfill its function properly, *United States v. Clark*, 475 F.2d 240, 250 (2d Cir. 1973).

■ While we reaffirm the sound practice of this Court to invoke the plain error rule sparingly, we conclude, nevertheless, that this case requires its application. We have determined that appellants were convicted on Count II of kidnapping despite clearly insufficient circumstantial evidence of an element of the crime that goes to the very source of the trial court's jurisdiction. We have also concluded that the single most likely basis upon which the jury found guilt beyond a reasonable doubt was the court's inclusion of the unconstitutional presumption in the charge. Without the inclusion of the § 1201(b) presumption, we believe it highly unlikely that a reasonable juror could fairly have found that Buster Huggins was transported in interstate or foreign commerce. The jury's almost certain reliance on the erroneous presumption allowed them to find beyond a reasonable doubt an element of the crime essential to the court's jurisdiction over the kidnapping count of the indictment. An instruction to the jury which embodies a constitutional defect of the magnitude found here while there is such a paucity of evidence of the fact presumed is plainly erroneous.

Because we decide that the inclusion of the § 1201(b) presumption in the charge had a significant, if not overriding, effect on the substantial rights of appellants Moore and Burnell, we must reverse their convictions on Count II despite their failure to take exception to the charge below.

II.

■ Having reversed the defendants' convictions on Count II because there was insufficient evidence to prove the jurisdictional element of kidnapping under 18 U.S.C. § 1201(a), this Court must now decide whether there was sufficient evidence to sustain a conviction for conspiracy to kidnap in violation of 18 U.S.C. § 1201(c). We hold that there was.

Section 1201(c) of 18 U.S.C. provides:

(c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

Two elements of the conspiracy charge in Count II cause the Court little problem. First, there were obviously two persons involved, and there is ample evidence that those two persons, Moore and Burnell, were engaged in a conspiracy. Second, assuming for the moment that their conspiracy was one to kidnap Buster Huggins and to transport him in interstate or foreign commerce, there is also ample evidence of a number of overt acts done to effect the object of that conspiracy. Those acts include the actual kidnapping of Huggins, Burnell's alibi calls to Lee, the ransom demand telephone calls to Wigfall and the Huggins' residence, and the drive to Korvette's parking lot near where Wigfall was to receive instructions regarding the ransom delivery. As in the case of conspiracies prosecuted under 18 U.S.C. § 371, the Government need not prove an overt act involving each element of the substantive offense. *See Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942) ("The overt act, without proof of which a charge of conspiracy cannot be submitted to the jury, may be that of only a single one of the conspirators and need not be itself a crime."); *see also Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

The primary question regarding Count I is whether, having failed to show actual interstate transportation as an element of the substantive offense charged in Count II,

the Government has failed to prove adequately that the two defendants conspired to kidnap Huggins and to transport him in interstate commerce. As stated above, there is ample evidence from which the jury could have concluded that Huggins was kidnapped and held for ransom and that Moore and Burnell were his kidnappers. Furthermore, a conspiracy in violation of 18 U.S.C. § 1201(c) may be proven even though the conspirators never actually crossed a state line. *Cf. Eaker v. United States*, 76 F.2d 267 (10th Cir. 1935) (Defendants convicted of conspiracy to transport a kidnap victim in interstate commerce in violation of Act of May 18, 1934, ch. 301, §§ 1, 2, 48 Stat. 781 (repealed 1948), the sections from which 18 U.S.C. § 1201(c) was derived). In *Eaker* the kidnappers planned to transport their victim from Colorado to Wyoming. They began driving the victim from Denver toward Laramie, Wyoming, but before they reached the Wyoming line, they changed their plans and returned to Denver. Because there was proof that the victim had been kidnapped, that defendants had planned to transport the victim interstate, and that defendants had committed an overt act to further the conspiracy, the court held there was sufficient proof of violation of the statute.

Here there is evidence that Moore and Burnell did plan to transport Huggins in interstate commerce. Before the kidnapping, Burnell told his girlfriend that Moore would probably have someone take Huggins "out of the states."[12] During one of the ransom calls, Moore told Martha Wigfall that they were getting ready to take Huggins "out of town."

While it is arguable that appellants' conspiracy did not include an intention to transport Buster Huggins in interstate or foreign commerce, the evidence outlined above must be viewed in the light most favorable to the Government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Hawley*, 554 F.2d 50, 52 (2d Cir. 1977). That evidence was sufficient to permit a reasonable juror to conclude beyond a reasonable doubt that the conspiracy did include such an intention. *See United States v. Rivera*, 513 F.2d 519, 529 (2d Cir.), *cert. denied*, 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975); *United States v. Taylor*, 464 F.2d 240 (2d Cir. 1972). Accordingly, the convictions on Count I are affirmed.

### III.

The last point we must address is Burnell's claim that there was insufficient evidence that he made any interstate telephone call to support his conviction on Counts III and IV. This claim has no merit.

Burnell's primary contention in this regard is that the voice identification made by the recipients of the call to the Huggins' residence in South Carolina was unreliable. He argues that Mrs. Huggins made two inconsistent identifications of that caller, and that Ira Huggins, who identified the caller as Burnell, made his identification in circumstances which were unduly suggestive.

Mrs. Huggins' identification of the caller was never presented to the jury by the Government. After Burnell's counsel strayed into this area on cross-examination, counsel reached a stipulation that Mrs. Huggins had identified both Moore's and Burnell's voices as the voice of the person with whom she spoke on December 1. The effect of this stipulation, the court told the jury, was that there was *no* identification by Mrs. Huggins. Burnell's counsel did not object to this instruction.

---

**12.** Mary Burch's testimony was that Burnell told her "[Moore] was having somebody take care of everything, that they would probably take [Huggins] out of states [sic]. . . . They would probably take [Huggins] out of the states where he would never be found." Trial Transcript at 348–49. As we said earlier, we do not decide whether these statements were properly admitted to show that Moore and Burnell actually took Huggins out of New York State. The statements, however, were properly admitted against both Moore and Burnell under Fed.R.Evid. 801(d)(2)(A) and (E) to show that a part of their conspiracy to kidnap Buster Huggins included a plan to transport him in interstate commerce. *See United States v. Annunziato*, 293 F.2d 373 (2d Cir.), *cert. denied*, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

Upon hearing a recording of Burnell's voice at trial, Ira Huggins unequivocally identified it as the voice he had heard during the December 1 call. He had previously made an out-of-court identification from a different recording of Burnell's voice. We find nothing unduly suggestive in these identifications and conclude that the likelihood of irreparable misidentification was slight, if not nonexistent.

Furthermore, there was ample circumstantial evidence of both the conspiracy to transmit a demand for ransom in interstate commerce and the actual transmission of the ransom demand to justify Burnell's conviction on Counts III and IV. Both calls on the evening of December 1 related the same basic message. The person who made the 6:30 A.M. call to Wigfall referred to the fact that Huggins had spoken to his mother the previous night. The threats and instructions related by the callers in each of the subsequent calls were entirely consistent with the threat made in the call to South Carolina. The entire series of calls proves conclusively that Moore and Burnell had together undertaken to transmit a demand for ransom in interstate commerce on December 1.

Accordingly, the convictions on Counts III and IV are affirmed.