Filed 6/28/24  P. v. Bracamontes CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ISAAC GARCIA BRACAMONTES,<br><br>    Defendant and Appellant. | H048925<br>(Santa Clara County<br>Super. Ct. No. C1885657) |

A jury found defendant Isaac Garcia Bracamontes guilty on three counts of aggravated sexual assault and 10 counts of lewd acts upon three victims, with true findings on multiple victim allegations as to each of the lewd acts.  The jury found Bracamontes not guilty on three remaining counts.  The trial court imposed an aggregate sentence of 170 years to life in prison.

Bracamontes raises numerous claims on appeal.  First, he contends the trial court erroneously instructed the jury based on CALCRIM No. 1191B that it could use evidence proving one or more of the charged offenses to infer he was disposed to commit sexual offenses and did commit the other charged offenses.  Second, Bracamontes contends the trial court violated the rules of evidence and his constitutional rights by excluding certain photographs defense counsel offered for impeachment purposes, and by limiting defense counsel's redirect examination of a character witness.  We reject these claims for the reasons below.

Third, Bracamontes contends the evidence was insufficient to support one of the convictions for aggravated sexual assault by sexual penetration. The Attorney General concedes the merits of this claim, and we accept the concession. Bracamontes argues this claim requires reversal of all his convictions, but we reject this argument and conclude only one conviction must be reversed. Bracamontes further argues the trial court erroneously instructed the jury on the requirement of unanimity as to the third count of aggravated sexual assault, but we conclude this claim is moot given our reversal of that conviction.

Finally, Bracamontes contends cumulative prejudice from multiple errors requires reversal, and he argues any enhancements for the true findings on the multiple victim allegations must be vacated if we reverse all the convictions pertaining to two of the three victims. We reject these claims for the reasons below.

Accordingly, we will reverse the conviction for aggravated sexual assault on the third count, and we will remand the matter to the trial court for resentencing.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The prosecution charged Bracamontes with 16 counts: counts 1 through 3—aggravated sexual assault by forcible sexual penetration of a child under 14 and seven or more years younger than the defendant (Pen. Code, §§ 269, subd. (a)(5), 289, subd. (a))[2]; counts 4 through 7, and counts 14 through 16—lewd or lascivious act upon a child under 14 (§ 288, subd. (a)); and counts 8 through 13—lewd or lascivious act upon a child under the age of 14 years by force, violence, duress, menace, and fear (§ 288, subd. (b)(1)). As

---

[1] In case No. H052051, Bracamontes petitions for writ of habeas corpus challenging the conviction. On April 26, 2024, we ordered the petition considered with this appeal. We later vacated the order of April 26, 2024, and ordered instead that the habeas petition proceed in this court separately from this appeal.

[2] Subsequent undesignated statutory references are to the Penal Code.

2

to counts 4 through 16, the prosecution further alleged Bracamontes committed the offenses against more than one victim (§ 667.61, subds. (b), (e), & (j)(2)).

The case proceeded to trial in 2019. The jury acquitted Bracamontes on counts 10, 15, and 16, but found him guilty on all remaining counts as charged. The jury found the multiple victim allegations true as to counts 4 through 9, and counts 11 through 14.

The trial court imposed an aggregate sentence of 170 years to life in prison. The sentence consisted of consecutive terms of 15 years to life on counts 1, 3, and 14, and consecutive terms of 25 years to life on counts 8, 9, 11, 12, and 13. The court also imposed concurrent terms of 15 years to life on counts 2, 4, and 5, and the court stayed the terms for counts 6 and 7.[3]

### B. Facts of the Offenses

Around 2005, when Bracamontes was about 27 years old, he moved in with his girlfriend, R.G. R.G. had two daughters at the time: Doe 1, who was about eight or nine years old, and Doe 2, who was about three or four years old.[4] Bracamontes and R.G. then had two daughters together: Doe 3, born in 2005; and Doe 4, born in 2008. At some point between 2011 and 2013, Bracamontes and R.G. separated and he moved out. The daughters continued to live with R.G., but Bracamontes saw Doe 3 and Doe 4 when they came to his house for scheduled visitations.

The prosecution alleged Bracamontes sexually molested Doe 1, Doe 2, Doe 3 and Doe 4 between October 2005 and December 2017.

---

[3] The abstract of judgment contains two errors. It incorrectly categorizes the term for count 4 as consecutive rather than concurrent, and it incorrectly categorizes the term for count 14 as concurrent rather than consecutive. We will order the trial court to correct the errors on remand. (See *People v. Jones* (2012) 54 Cal.4th 1, 89 [when the abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, the reviewing court has the power to correct the clerical error on appeal, whether on its own motion or upon application of the parties].)

[4] We refer to the victims as Doe 1-4, use initials to identify other persons, and delete specific addresses to protect the privacy of all persons in the case. (Cal. Rules of Court, rule 8.90(b).)

### 1. Offenses Against Doe 1 (Counts 1-7)

Doe 1 was 23 years old when she testified at trial. When she was around 8 or 9, Bracamontes started dating her mother, R.G. Doe 1 thought Bracamontes was nice at first, and they did things together with her mother and siblings such as going out to eat or going to the park. Doe 1 did not consider Bracamontes to be like a stepfather because she was still in contact with her natural father.

When Doe 1 was around 10 or 11 years old, she lived in a duplex with Bracamontes, R.G., and Doe 2. Bracamontes's sister was visiting from Mexico, and she also lived there for a while. One night Doe 1 was sleeping on the living room floor when she was awakened by someone lying down next to her. She felt someone's hand touching her breasts and she felt breathing in her ear from someone behind her. She knew it was Bracamontes when he started talking in her ear because it was the voice of a man, and he was the only man in the house. At first he was only touching her breasts over her clothes, but then he touched her breasts under her shirt, and eventually he touched her vagina inside her underwear. He was touching her skin-to-skin, and his hand went in between her vaginal lips but no further inside. He went back and forth between her breasts and her vagina for more than 30 minutes, and she estimated he probably switched back and forth more than five times. Doe 1 testified that she felt part of Bracamontes's hand touching her in between her vaginal lips at least two times, but he did not go further inside her vagina. When the prosecutor asked Doe 1 if she felt any part of Bracamontes's hand go between her vaginal lips at least three times, she responded, "I don't know." At some point, Bracamontes got up and went back to the bedroom.

Doe 1 felt scared and confused. She did not move or reveal that she was awake because she was embarrassed and felt sort of paralyzed. Bracamontes's sister was sleeping on the living room floor next to Doe 1 while this was happening.

There were other times at the duplex when Bracamontes touched Doe 1 sexually, but she could not remember the details. Most of those times he touched her on the

4

breasts, but it was hard for her to recall details because she had tried to block out the memories of that time in her life. Even though she wasn't sure what he was doing, a part of her knew it was wrong. Doe 1 did not tell her mother about it because she felt her mother was happy, and Doe 1 was scared to take that away from her. She also did not want to tell her father.

Doe 1 recalled another incident when they were living in a house on [X] Street. It happened no more than a month after R.G. gave birth to Doe 3 in December 2005. Doe 1 was lying on her mother's bedroom floor, watching the newborn Doe 3 while her mother was taking a shower. Doe 1 heard Bracamontes coming home from work, and she felt uncomfortable around him so she pretended to be asleep. He came into the bedroom and lay down behind Doe 1 with his body touching hers. Then she felt his hand touching her breasts over her clothing. His hand stayed outside of her shirt, but she could feel him rubbing and playing with her nipples. When her mother turned off the shower, Bracamontes got up right away and went to tell her he was home. Doe 1 did not tell him to stop because she felt scared and embarrassed.

When Doe 1 was 11, she spoke with her friend A.O. about Bracamontes. Doe 1 and A.O. had met in the fifth grade, and they had known each other for about a year. When the school held a "sex ed workshop" for girls, one of the other girls "said something about something happening to her," and the girl was taken to the principal's office. Doe 1 then realized that something similar was happening to her. Later that week, A.O. asked Doe 1 why she did not get along with Bracamontes. After reminding A.O. about the girl who'd been taken out of the workshop, Doe 1 said Bracamontes was doing something similar to her. Doe 1 did not go into details, but she asked A.O. not to tell anyone.

A.O. testified about her memory of the conversation. She was 24 at the time of trial. A.O. testified that she and Doe 1 were very close, and A.O. would sleep at Doe 1's house sometimes. A.O. noticed that Doe 1 did not get along well with Bracamontes most

5

of the time. When they were in the sixth grade, A.O. saw Doe 1 react angrily towards Bracamontes and asked her why she wasn't nice to him. Doe 1 said she wanted to tell A.O. "something that was really serious," but that they could never talk about it again. Doe 1 then told A.O. that Bracamontes would "touch her parts where he wasn't supposed to." Doe 1 did not go into details and asked A.O. never to tell anyone about it.

By the time Doe 1 was 17, she no longer had any relationship with Bracamontes. One day she was with her boyfriend when they saw Bracamontes, and her boyfriend waved hello to him. Doe 1 told her boyfriend not to do that, and he asked her why. She told her boyfriend that Bracamontes "had done things to me that he shouldn't have done," and asked her boyfriend not to tell anyone.

In February 2018, Doe 1 had a conversation with Doe 3 at their mother's apartment. Doe 1 had noticed that Doe 3 was making excuses not to go with Doe 4 on their scheduled visitations with Bracamontes. Doe 1 tried to encourage Doe 3 to visit him as a favor to Doe 4, but Doe 3 was adamant that she did not want to go. After Doe 1 emphasized to Doe 3 that she needed tell someone if something was going on, Doe 3 responded that she did not feel comfortable around Bracamontes, and she revealed some of the things that had happened between them. Doe 1 said she had experienced something similar and encouraged Doe 3 to tell somebody else about it. Two days later, R.G. told Doe 1 that Doe 3 had told a school counselor.

### 2. *Offenses Against Doe 3 (Counts 8-13)*

Doe 3 was 13 years old when she testified at trial. The earliest touching incident she could remember occurred when she was around five years old. Bracamontes, R.G., Doe 3, and another sibling were all sharing one bedroom, but her mother was not in the room at the time. Bracamontes called Doe 3 over to the bed and told her to lie down. He began touching Doe 3's breasts with his hands. It felt weird and made her uncomfortable, but she did not do anything because she was scared. She felt "some sort

6

of force" in the area where he was touching her, and she could not get up. He stopped when R.G. walked back into the room. Doe 3 did not say anything to her at the time.

Doe 3 remembered another incident that occurred when she was about five years old. Bracamontes, Doe 3, and her uncle were staying at the uncle's house, which had an attic-shaped upper floor with the uncle's bedroom and a lower floor with a living room where Doe 3 would sleep. Doe 3 was lying on some blankets on the floor of the living room with Bracamontes while the uncle was upstairs in his bedroom. Bracamontes started touching Doe 3's breasts with his hands, making her feel weird and uncomfortable. He stopped when her uncle started coming down the stairs. In her testimony the next day, after Doe 3 had refreshed her recollection by reviewing a video of an interview she had with an investigator, Doe 3 testified that Bracamontes had also touched her "[o]n my vagina" during this incident.

Around 2016, Doe 3 was at a party for Doe 4 with family and friends in the back yard of Bracamontes's house late at night. He was sitting in a chair with friends around, and he called Doe 3 over. As she was standing near him, he started rubbing her buttocks inappropriately. Doe 3 testified that she remembered "being really scared and really uncomfortable at the moment." After she had refreshed her recollection by watching the video of her interview with the investigator, Doe 3 testified that she recalled she was wearing pants at the time of the incident, and that Bracamontes "went inside my pants a little bit over my underwear."

Starting around 2013, after R.G. and Bracamontes separated, Doe 3 went to Bracamontes's house regularly for scheduled visitations with him. This lasted until 2017. There were often times when Doe 3 did not want to go on the visits because of things Bracamontes was doing to her, such as the inappropriate touchings, and because he was having a lot of anger issues towards her and her siblings. Bracamontes was drinking a lot, and when he did something that made Doe 3's siblings sad, it made her sad too, and he would apologize to them.

7

Doe 3 testified that there were a number of times around 2016 or 2017 when Bracamontes would start rubbing her leg up and down. He would do this when Doe 3 was sad about something, and he would apologize to her while rubbing her leg up and down. Then his hand would move up her thigh and he would rub her on top of her vagina. Doe 3 estimated that he did this about ten times, and it was always over her clothes. She felt weird and uncomfortable when he did it, but she never did anything in response because she was nervous and scared. She was 10 and 11 years old at the time.

During one of the scheduled visitations on December 8, 2017, Bracamontes slapped Doe 3 on the face. She had wanted to go to her sister's soccer game, but R.G. forced Doe 3 to go to a scheduled visitation with Bracamontes at his house. Doe 3 got angry with him because he did not let her sleep, and eventually she started crying. He tried to hug Doe 3 but she was mad, so she tried to push him away, whereupon he "slapped [her] face really hard." Doe 3 testified that she was "very scared" at that moment, and she got so nervous that she urinated.

Doe 3 later told R.G. about the incident, and from that point on, R.G. stopped making Doe 3 visit Bracamontes if she did not want to go. She stopped visiting him around that time. The parties agreed to the following stipulation: "After Mr. Bracamontes slapped [Doe 3], there was a temporary protective order against Mr. Bracamontes protecting Doe 3."

The first time Doe 3 told anyone about Bracamontes touching her was in a conversation with Doe 1. Doe 1 had asked Doe 3 why she did not want to visit Bracamontes, and at first Doe 3 said it was because he had hit her. Then she reconsidered and disclosed that Bracamontes had "touched me in places he shouldn't have." A few days later, Doe 3 told R.G. about it. Around the same time, Doe 3 told her school counselor, and the police came later that day.

8

### 3. Lewd or Lascivious Act Against Doe 2 (Count 14)

Doe 2 was 18 years old when she testified at trial. Bracamontes started living with her mother around the time Doe 2 was in the first grade. Along with her siblings, they spent time together as a family, and Doe 2 called Bracamontes "Isaac," or sometimes "Dad." Doe 2 did not know her natural father, and she thought of Bracamontes as kind of a father because they lived together.

When Doe 2 was around seven years old, they lived in a trailer on M. Avenue. Doe 2 recalled an incident that occurred when R.G. had gone to the store with the other children, and Doe 2 had stayed home with Bracamontes. Doe 2 was lying on the bed in her mother's room watching television, and Bracamontes was lying on the bed next to her. Bracamontes was rubbing her stomach, and at first it felt like a normal belly rub, but then he lowered his hand and put it on her vagina. Doe 2 could not remember if he touched her vagina under her pajamas or over them. He was rubbing her vagina with his hand moving in a circular motion. He did this for a couple minutes. He just touched the top of her vagina; she did not think his fingers went in between the vaginal lips. Doe 2 was shocked, and her body felt weird. She did not say anything because she was scared.

Bracamontes never touched Doe 2 like this again, and he never touched her on any other part of her body such as her breasts or buttocks. Doe 2 told R.G. about it. Doe 2 said Bracamontes had "touched me in a weird way," but she did not say much about it because she did not feel comfortable. Doe 2 did not remember anything happening after she told her mother about it. They continued to live with Bracamontes, and Doe 2 thought he was nice to her. He would buy her things, and if she asked him for money, he gave it to her. Doe 2 never told anyone else about it until Doe 3 told R.G. something that resulted in the police coming to talk to them.

### 4. Offenses Against Doe 4 (Counts 15 and 16)

Doe 4 did not testify at trial. Doe 3 testified that she had seen Bracamontes touch Doe 4 in a way that was similar to how he had touched Doe 3. Doe 3 was in the kitchen

9

at the time, but she could see into Bracamontes's bedroom. She saw Bracamontes and Doe 4 on the bed, similar to the position Doe 3 had been in when he touched her breasts. Bracamontes was rubbing Doe 4's leg up and down just as he had done to Doe 3 on multiple occasions. Doe 3 saw his hand go into the area of Doe 4's vagina, but Doe 3 could not see from her angle whether Bracamontes actually touched Doe 4's vagina. It looked like he was using the same hand motion he had used to touch Doe 3's vagina. Doe 3 could not remember when this incident occurred.

The parties stipulated to the following: Doe 4 was interviewed by a social worker on February 8, 2018. She was nine years old at the time. The social worker asked Doe 4 questions about whether anyone had touched her in a way she did not like, and he asked her questions about her father. Doe 4 answered the questions and did not say that her father had touched her in an inappropriate way. On March 8, 2018, Doe 4 was interviewed by a forensic interviewer with a background in social work. The interviewer asked Doe 4 a series of questions about her family, her father, and her body. She answered the questions and did not say that her father had touched her in an inappropriate way.

## II. DISCUSSION

### A. Validity of the Jury Instruction Based on CALCRIM No. 1191B

Bracamontes contends the trial court violated his state and federal due process rights by instructing the jury with CALCRIM No. 1191B that it could infer, based on proof from certain of the charged offenses, that he was disposed to commit and did commit the other charged crimes. The Attorney General argues the California Supreme Court has upheld the jury instruction, and that the permissive inferences authorized by the statute comport with state and federal due process requirements.

#### 1. Background

Consistent with CALCRIM No. 1191B, the trial court instructed the jury, "The People presented evidence that the defendant committed the crimes charged in Counts 1

10

through 16.  If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but you are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely and did commit the other sex offenses charged in this case.  [¶]  If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all of the other evidence.  [¶]  It is not sufficient by itself to prove that the defendant is guilty of another crime.  The People must still prove each charge and each [allegation] beyond a reasonable doubt.”

Defendant did not object to this instruction or request any modifications to it.

### 2.  *Legal Principles*

“[I]nstructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant’s rights under both the United States and California Constitutions.”  (*People v. Flood* (1998) 18 Cal.4th 470, 479-480 (*Flood*).)  We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210; *People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)  Jury instructions “ ‘may not be judged in artificial isolation,’ but must be considered in the context of the instructions as a whole and the trial record.” ’ [Citations.]”  (*People v. Lemcke* (2021) 11 Cal.5th 644, 655.)

A “presumption” is “an assumption of fact that the law *requires* to be made from another fact or group of facts found or otherwise established in the action,” whereas an “inference” is “a deduction of fact that *may* logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.”  (Evid. Code, § 600, italics added.)  The United States Supreme Court defines a “permissive presumption” as an instruction by which the factfinder is allowed—but not required—to use facts that have been proven directly by evidence to draw an inference about other facts required to prove the elements of a crime.  (See *Ulster County Court v. Allen* (1979)

11

442 U.S. 140, 157 (*Ulster County*).)  A permissive presumption is substantially the same as an inference as defined by the Evidence Code.  (*People v. McCall* (2004) 32 Cal.4th 175, 183.)  Accordingly, California courts also refer to a permissive presumption as a "permissive inference."  (See, e.g., *People v. Goldsmith* (2014) 59 Cal.4th 258, 270.)

"Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference."  (*Ulster County*, *supra*, 442 U.S. at p. 157.)  The high court evaluates the validity of permissive presumptions as applied to the facts of the case as set forth in the record.  (*Id.* at pp. 162-163.)  (See also *Francis v. Franklin* (1985) 471 U.S. 307, 314-315 [a permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury]; *People v. Goldsmith* (2014) 59 Cal.4th 258, 270 [permissive inferences violate due process only if the permissive inference is irrational].)  When reviewing an instruction constituting a permissive presumption, the court requires the party challenging it to demonstrate its invalidity as applied to him or her.  (*Ulster County*, at p. 157.)

### 3.  *Instructing the Jury Based on CALCRIM No. 1191B Was Not Error*

Bracamontes acknowledges that the California Supreme Court upheld an instruction based on CALCRIM No. 1191B in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*).  (See also *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016 (*Reliford*) [jury instruction based on 1999 version of CALJIC No. 2.50.01 was not unconstitutional].)  He argues nonetheless that we are not bound by this precedent because the California Supreme Court did not consider whether the instruction was consistent with the United States Supreme Court's opinion in *Ulster County*, *supra*, 442 U.S. 140.  Bracamontes further argues that the instruction reduced the prosecution's

12

burden of proof in violation of due process under the California Constitution. (See *Flood*, *supra*, 18 Cal.4th at pp. 479-480.)

The court instructed the jury that if the prosecution presented evidence proving beyond a reasonable doubt that Bracamontes committed one or more of the crimes, the jury was *allowed*—not *required*—to conclude from that evidence he was disposed or inclined to commit sex offenses. And based on that conclusion, the jury could further conclude—but was not required to conclude—that he was likely to commit and did commit the other charged offenses. Because the instruction permitted the jury to draw these inferences and did not require them, it constituted a "permissive presumption" under *Ulster*, *supra*, 442 U.S. at page 157. Accordingly, Bracamontes argues we must look to the facts in the record and consider whether there was no rational way the jury could reach the conclusions allowed by these inferences.

Although Bracamontes's brief states this standard accurately, he does not cite any facts in the record in support of the proposition that there was no rational way the jury could make the connection permitted by the inference. The only cite to the record in this section of his opening brief is a reference to the testimony of the complaining witnesses, which he characterizes as the only substantial evidence supporting the respective convictions.[5] But Bracamontes does not explain how that would show the jury had no rational way to draw the inferences permitted by the instruction. The jury was instructed that it could rely entirely on the testimony of a single witness to prove any fact. If the jury credited the testimony of one complaining witness with respect to the facts necessary to convict Bracamontes on one of the offenses, that provided the only condition required by the instruction, and the jury thereby had a rational basis in the evidence to draw the inferences permitted by the instruction. Because Bracamontes does not identify any facts

---

[5] Bracamontes cites additional facts from the record in a subsequent section of the brief arguing any error was not harmless, but he makes no argument that any of these facts would render the instruction invalid under *Ulster County*.

13

in the record to show the jury had no rational way to draw those inferences, we must reject this claim.[6]

Instead of making the factual showing required under *Ulster County*, Bracamontes premises his argument by asserting the inferences allowed by the instruction are irrational, and he argues that nothing in the facts of this case shows they are rational. This turns the *Ulster County* standard on its head, putting the burden on the Attorney General to disprove the appellant's claim on appeal based on the facts in the record even though the appellant failed to raise it below. A proper application of the standard requires the party challenging the instruction to demonstrate its invalidity as applied to them. (See *Ulster County*, *supra*, 442 U.S. at p. 157.) Furthermore, the Legislature's enactment of Evidence Code section 1108 and the California Supreme Court's approval of the instruction necessarily compel us to start with the assumption that the inferences allowed by the instruction are rational as a general matter. (See *Villatoro*, *supra*, 54 Cal.4th at p. 1164, quoting Assembly Committee's analysis of Evidence Code section 1108, [" 'The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative . . . .' "]; *Reliford*, *supra*, 29 Cal.4th at p. 1012 [it is reasonable to allow the jury to infer disposition based on evidence of other sex crimes]; *People v. Falsetta* (1999) 21 Cal.4th 903, 915 [evidence that defendant committed other sex offenses is at least circumstantially relevant to the issue of defendant's disposition or propensity to commit these offenses].) (See also *People v. Alcala* (1984) 36 Cal.3d 604, 631 [propensity evidence is deemed objectionable not because it has no appreciable probative value, but because it has too much].) This Court has likewise acknowledged a

---

[6] At oral argument, when asked what facts in the record show the instruction was irrational, counsel asserted various weaknesses in the witness's testimony, but he did not explain how these asserted weaknesses would render the inferences permitted by the instruction irrational.

rational basis for the use of propensity evidence in sex offenses, provided there is some degree of similarity in the acts underlying the offenses. (*People v. Earle* (2009) 172 Cal.App.4th 372, 398 (*Earle*).) In any event, Bracamontes has not identified any facts in the record that might show this connection was irrational. Absent any showing based on the facts of the case, we must reject Bracamontes's assertion that the inferences are irrational.

Bracamontes argues we may consider "generally available information on the subject" to determine whether the inferences are rational. For this proposition, he relies on *Leary v. U.S.* (1969) 395 U.S. 6 (*Leary*) and *U.S. v. Moore* (2nd Cir. 1978) 571 F.2d 76 (*Moore*). Neither case supports that proposition, as neither concerned the validity of a permissive inference as defined by *Ulster County*, *supra*, 442 U.S. at page 157.

In *Leary*, Dr. Timothy Leary was convicted of transporting or concealing marijuana that had been imported to the United States while knowing it had been imported illegally. (*Leary*, *supra*, 395 U.S. at p. 30.) The elements of the offense required proof that the marijuana had been imported to the United States as well as the defendant's knowledge that it had been illegally imported. The Court considered the validity of a presumption instructing the jury that if the evidence proved Dr. Leary had the marijuana in his possession, " 'such possession *shall* be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury.' " (*Ibid.*, italics added.) The Court engaged in an extended analysis of empirical data concerning the percentage of marijuana consumed in the United States that had been imported, as well as research into how much marijuana users knew about the sources of their marijuana. (*Id.* at pp. 39-52.) Based on this analysis, the Court concluded it was irrational to presume a defendant who possessed marijuana would know whether it was imported, and the Court held the presumption was invalid. (*Id.* at p. 53.)

*Leary* does not support Bracamontes's claim. First, the presumption at issue in that case told the jury that possession *shall* be deemed sufficient evidence to authorize a

conviction unless the defendant explained otherwise. This made the presumption mandatory, at least until it was rebutted.[7] The Court in *Ulster County* expressly distinguished between the mandatory presumption in *Leary* and permissive presumptions, holding that "a mandatory presumption is a far more troublesome evidentiary device" because it may affect the prosecution's burden of proof. (*Ulster County*, *supra*, 442 U.S. at p. 157, citing *Leary*, *supra*, 395 U.S. at p. 30.) The *Ulster County* Court observed that prior cases had therefore treated mandatory presumptions as susceptible to facial challenges, unlike a permissive presumption or inference. (*Id.* at pp. 157-158.) But even if we allowed Bracamontes to support his claim using empirical research and data from outside the record, he offers no such sources.

Bracamontes's reliance on *Moore*, *supra*, 571 F.2d 76, is misplaced for similar reasons. In *Moore*, the defendants challenged their convictions for kidnapping under a federal statute that included an element requiring that the victim be " 'willfully transported in interstate or foreign commerce.' " (*Id.* at p. 81.) Another subdivision of the statute provided, " 'the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away *shall create a rebuttable presumption* that such person has been transported in interstate or foreign commerce.' " (*Ibid.*, italics added.) The trial court further instructed the jury, " 'Under the law, the failure to release a kidnapping victim within 24 hours creates a presumption that the victim has been transported in interstate or foreign commerce, and you *may* so find. You are *not required* to so find. This presumption is not conclusive, and it may be refuted or disproved by contrary evidence, and it may simply not be accepted by you as jurors. [¶] In sum, you are to look at all the evidence

---

[7] In California courts, such a presumption would likely be considered a "rebuttable presumption" under Evidence Code section 601. In accordance with the high court's reasoning in *Ulster County*, California courts may conclude a rebuttable presumption is invalid based on a facial challenge. (See *People v. Roder* (1983) 33 Cal.3d 491, 498-504.)

16

in this case, not only the presumption that I just mentioned to you but the entirety of the proof before you and decide whether or not the government has proved beyond a reasonable doubt that [the victim] was in fact transported in interstate or foreign commerce.' " (*Moore*, at pp. 82-83, italics added.)

Bracamontes characterizes these instructions as creating a "permissive inference," presumably because the jury was told "you may" adopt the presumption but "you are not required to so find." But the Court of Appeals in *Moore* construed the permissive language to mean the trial court was being "careful to point out that the presumption was rebuttable." (*Moore*, *supra*, 571 F.2d at p. 82.) The Court therefore treated these instructions as creating a rebuttable presumption of the same kind at issue in *Leary*, and accordingly the Court applied the same analytical approach to determine whether it was valid. (*Id.* at pp. 85-87.) The Court found there was "virtually no empirical data" to support the presumption, such that its application violated due process. (*Id.* at pp. 86-87.)

Both parties in this case agree the instruction based on CALCRIM No. 1191B creates a permissive inference as defined by *Ulster County*, not a mandatory presumption or rebuttable presumption. Because *Moore* treated the instructions as a rebuttable presumption and applied the standard for the validity of a rebuttable presumption as set forth in *Leary*, *Moore* is inapposite. Furthermore, the decisions of lower federal courts interpreting federal law are not binding on this Court, (*People v. Williams* (1997) 16 Cal.4th 153, 190), and *Moore* has no persuasive force with respect to the instruction at issue here.

Bracamontes also relies on *People v. James* (2000) 81 Cal.App.4th 1343 (*James*) to support his claim. James appealed from a conviction for domestic violence under section 273.5 after a jury trial in which the court admitted evidence under Evidence Code section 1109 that he had committed prior acts of domestic violence. (*James*, at pp. 1347-1349.) James challenged an instruction the trial court gave based on the 1997 version of CALJIC No. 2.50.02, which told the jury, in part: " 'If you find that the defendant

17

committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type offenses.  If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.' "  (*James*, at pp. 1349-1350.)  The trial court further instructed the jury it could not consider that evidence for any purpose unless the jury found by a preponderance of the evidence that James had committed the prior offense, and the jury was told the prosecution bore the burden of proving the prior offenses under that standard.  (*Id.* at p. 1350.)

The Court of Appeal held the inferences allowed by this instruction failed to meet the due process standard set forth in *Ulster County*.  (*James*, *supra*, 81 Cal.App.4th at p. 1356.)  The Court observed that the instruction allowed for a propensity theory of guilt starting with the initial finding that James had committed a prior offense, together with a series of inferences that could be connected to reach the conclusion he was guilty of the charged offense.  (*Ibid.*)  The Court further observed that "none of the connections permitted by the instructions is moored to any of the facts of the charged offense."  (*Ibid.*)  The Court acknowledged the jury was also instructed that it had to find the prosecution had proved beyond a reasonable doubt the facts required by the elements of the charged offense to find James guilty.  (*Id.* at p. 1351.)  But the Court found it was reasonably likely that the jury interpreted the instructions as a whole to mean it could rely solely on the propensity theory of guilt to convict James of the charged offense.  (*Id.* at p. 1354.)  The Court concluded that this instruction violated due process under *Ulster County* because there was no rational way a jury could make the connections permitted by the instruction without considering the facts of the charged offense.  (*Id.* at p. 1356.)

Bracamontes asserts that the same reasoning invalidates the jury instruction at issue here, but we are not persuaded.  While the wording and logic of the instruction considered in *James* are similar to the wording and logic of the instruction in this case, there are material differences between the two instructions.

18

First, Bracamontes sets forth no valid legal grounds for us to invalidate the jury instruction by declaring it irrational on its face. Indeed, at trial the defense introduced expert testimony from a clinical psychologist who had evaluated Bracamontes to determine whether his psychological profile was consistent with that of a pedophile. Among other methods, the expert relied on Bracamontes's responses to the Sexual Violence Risk-20 test, which provided information about "someone's characteristics regarding sexual deviancy or sexual *propensity*," according to the expert. (Italics added.) Thus, the defense's own expert assessment reflected the notion that pedophiles tend to exhibit identifiable psychological characteristics, and at least one of the methods relied upon by the expert incorporated a theory of sexual propensity. And while the expert also testified that Bracamontes scored low on these tests, the jury was free to credit or reject the expert's opinions.

Second, the instruction given here and that in *James* are different in critical respects. The jury instruction in this case told the jury that if it concluded beyond a reasonable doubt that Bracamontes had committed one or more of the charged offenses, it had the option to conclude from that evidence that he had a disposition to commit sex offenses. But the jury was also told "that conclusion is only one factor to consider along with all of the other evidence." The jury was further instructed that its conclusion that Bracamontes had a propensity to commit sex offenses was "not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and each [allegation] beyond a reasonable doubt." By contrast, in *James* the challenged instructions allowed the prosecution to prove by the less rigorous preponderance of the evidence standard a prior uncharged offense, which the jury could then use as propensity evidence to infer that the charged offenses had occurred. Here, the language circumscribing the jury's reliance on an initial conclusion that Bracamontes committed one or more of the charged crimes beyond a reasonable doubt—language that was absent from the instructions in *James*—made it unlikely the jury relied solely on a

19

propensity theory to convict him on other charged offenses without considering the facts of those other offenses. Indeed, the jury acquitted Bracamontes on three counts, suggesting the jury did not rely solely on a propensity theory of guilt without consideration for the strength or weakness of the evidence offered to prove the specific set of elemental facts required under each individual count.

Finally, we note that the California Supreme Court considered a jury instruction based on the same inferences permitted by the instruction here, and the Court upheld it as valid, at least when the jury is further instructed—as the jury in this case was instructed— not to rely solely on the defendant's commission of another offense, and to consider all the other evidence, in deciding whether the prosecution has proven the elemental facts beyond a reasonable doubt. (*Reliford*, *supra*, 29 Cal.4th at p. 1013.) We are bound by that holding. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455 [under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction].)

Bracamontes also cites *Flood*, *supra*, 18 Cal.4th 470, for the proposition that the instruction violated his due process rights under the California Constitution as well as his federal due process rights. *Flood* concerned a jury instruction for a violation of Vehicle Code section 2800.3 where the Attorney General had conceded the instruction was unconstitutional. (*Id.* at p. 482.) Accordingly, the Court's analysis focused on the standard for evaluating harmless error under the California Constitution. *Flood* did not address the validity of a permissive inference or any other aspect of the instruction challenged here. Bracamontes makes no arguments and cites no authorities that would justify invalidating the instruction on state due process grounds distinct from the federal due process grounds addressed above.

For all the reasons above, we conclude Bracamontes has failed to show the jury instruction was invalid.

### B. The Trial Court's Evidentiary Rulings Excluding Certain Photographs and Limiting the Testimony of a Character Witness

Bracamontes challenges the trial court's evidentiary rulings in which it excluded a number of photographs offered by Bracamontes and limited the testimony of a character witness for the defense.

Bracamontes sought to introduce numerous photos of Doe 3 together with Bracamontes in which Doe 3 appeared to be happy or smiling. Defense counsel offered the photos to impeach Doe 3's testimony—which counsel elicited on cross-examination—that she had always been scared or terrified of Bracamontes. The trial court admitted six of the photos, each taken in a different year during the period when Doe 3 spent time with Bracamontes. The court excluded the rest of the photos as irrelevant or cumulative under Evidence Code section 352.

Bracamontes contends the trial court erred by admitting only six of the photos and excluding the rest. He contends the error violated the state law rules of evidence, his constitutional right to present a defense, and his Sixth Amendment right of confrontation. The Attorney General contends the trial court properly exercised its discretion to exclude most of the photos under Evidence Code 352, and that the ruling did not violate Bracamontes's constitutional rights.

### 1. Procedural Background

On the ground the evidence was cumulative, the prosecution moved in limine to exclude hundreds of photos that Bracamontes had produced in discovery. Defense counsel estimated he had produced approximately 300 photos and 50 videos to the prosecution, and counsel informed the court he had not yet decided which photographs might assist his defense. Counsel proposed to wait until witnesses had testified, whereupon counsel could identify the relevant photos and the parties could litigate them individually. When the court asked counsel what relevance the photos might have, counsel proffered that if a complaining witness testified she was terrified to be in the

21

presence of Bracamontes, a photo showing the witness was happy next to Bracamontes would be relevant to impeach her testimony. The court expressed skepticism about the probative value of such a photo given that a photo can only provide a snapshot of one moment in time. The court agreed, however, that its relevance would depend on the witness's testimony, so the court postponed any rulings on the photos until after the complaining witness had testified.

As set forth above in section I.B.2, Doe 3 testified on direct examination that she recalled feeling scared during the times when Bracamontes touched her inappropriately, and she felt "very scared" and nervous on the occasion when he slapped her, to the point where she involuntarily urinated. When asked why she did not say anything to anybody about the touching incidents, Doe 3 responded that she was scared Bracamontes "would do something to my family, in general, that he would do something to my mom possibly, my little sister."

Before defense counsel cross-examined Doe 3, counsel selected a subset of 28 photos for admission and presented arguments for their relevance. Counsel stated or estimated the year in which each photo was taken and described the general circumstances around the taking of each photo. The photos showed situations in which Doe 3 was near or next to Bracamontes, sometimes with other siblings, and defense counsel described the photos variously as showing Doe 3 as smiling, laughing, enjoying herself, hugging Bracamontes, or appearing comfortable in his presence. The court noted for the record that the photos all showed Doe 3 as appearing happy and comfortable. Counsel argued the photos were relevant to impeach Doe 3's statement that she was "always scared" around Bracamontes, and counsel asserted she had testified to that at the preliminary hearing. The court stated that it was unconvinced the photos constituted impeachment because a photo only captures a moment in time. The court added, "You can be an adult in an abusive relationship and have a wonderful Instagram feed. Photos are not necessarily representative of what's really happening." However, the court

22

acknowledged the photos might have probative value depending on Doe 3's testimony in cross-examination, and the court suggested counsel select one photo from each year if Doe 3's testimony provided a sufficient foundation for them.

On cross-examination, defense counsel questioned Doe 3 and she responded as follows:

"[Q:] First, as long as you can remember, your dad would verbally abuse you; correct?

"[A:] I believe so, yes.

"[Q:] And when you were in the presence of your dad, for as long as you can remember, you were always really scared; right?

"[A:] Yes.

"[Q:] So fair to say that whenever your -- you were next to your father, you were terrified; is that fair to say?

"[A:] Yes. That's fair to say.

"[Q:] And fair to say that whenever your father would take a picture, even with you, you were terrified; is that fair to say?

"[A:] Yes. It's fair to say.

"[Q:] Fair to say that even when you were taking a selfie with your father, at any time, you were terrified of him; is that fair to say?

"[A:] Yes. That's fair to say.

"[Q:] Fair to say that every time your father would touch you, even when they were taking a picture of you, you were terrified; is that fair to say?

"[A:] That's fair to say."

Defense counsel then questioned Doe 3 further about times when Bracamontes's new wife would take photos of Doe 3 with Bracamontes, and other times when Doe 3 and Bracamontes would take "selfies" of themselves together. Counsel asked Doe 3 if she was terrified in those situations, and she answered, "Yes." Counsel asked Doe 3 if she

23

had testified that she was terrified of Bracamontes because he had verbally abused her, and she responded, "Yes. That's one reason why." Counsel questioned Doe 3 about a time when she painted Bracamontes's fingernails while he was asleep. Doe 3 could not recall when this took place, but she conceded that she and Bracamontes laughed about it together when discovered she had painted his fingernails. Doe 3 testified, "It was very rare when I had a good connection with my dad. It was very rare when I had a good time with him. So that was one of the very few."

During a break in the testimony, the trial court ruled that Doe 3's testimony had provided a foundation for the admission of photos to impeach her testimony that she was terrified of Bracamontes even when the photos were taken. Defense counsel renewed his motion to admit all 28 of the photos, but the court denied the motion based on Evidence Code section 352, and the court indicated it would instead admit one photo from each year during the relevant time frame.

During another break in the testimony, the trial court ruled on the admissibility of each of the photos offered by defense counsel. After excluding some photos as cumulative because they were taken during same year as another photo, the court ruled that six of the photos were admissible—one for each of the years 2010, 2012, and 2014 to 2017.[8] The court further instructed counsel that he could renew his motion to admit additional photos if he adduced further testimony establishing a foundation for them.

When defense counsel resumed his cross-examination of Doe 3, he questioned her about the six photos and the trial court admitted them into evidence. When counsel showed each of the photos to Doe 3 and asked her whether she appeared to be scared or terrified of Bracamontes in each of the photos, she responded that she did not appear to be scared or terrified. She testified variously that she appeared to be happy, smiling, or

---

[8] Defense counsel did not move to admit any photos from 2011 or 2013 in the course of these rulings.

playful in the presence of Bracamontes; affectionate towards him; and comfortable while sitting on his knee.

Defense counsel reminded Doe 3 about her prior testimony—that she had been scared of Bracamontes even when someone was taking pictures of them—and counsel asked her if that was inaccurate. Doe 3 responded, "That wasn't the entire truth." Defense counsel further questioned Doe 3 about whether she was actually happy and comfortable with Bracamontes at the times the photos were taken, and whether she loved her him at the time. Doe 3 initially testified that she may not have been as happy as she appeared in the photos, but after repeated questioning about whether she loved Bracamontes at the time, she responded, "I don't know."

Doe 3 then responded that she wanted to add something to that, and after taking a moment to reflect on her thoughts, she explained as follows: "I remember saying that when I was little and my father had done some bad things, I didn't really necessarily know what to think of it and I didn't know that at that time it was bad. And I remember that clearly. And I can remember that very, very good. [¶] In other words, when I was little in these pictures as well, um, I loved my father, yes, at one point. And in all pictures I would show that too, because I didn't know what to think of all the things he did, as of drinking, as of verbally abusing, as of hitting, disciplining us. I didn't know what to think of it all. So I loved my father, not knowing the real truth behind it all, that it was bad."

In closing argument, counsel put forth a defense based on the theory that the complaining witnesses were lying about Bracamontes sexually assaulting them because he and R.G. were fighting over custody of the children, and the girls did not want to be with Bracamontes. Defense counsel described Doe 3 as the "prosecutor's lynchpin, keystone, foundation of their case," and he repeatedly asserted that she was lying in her testimony and her statements to the police. Counsel specifically argued that the photos showed Doe 3 had lied in her testimony about being scared or terrified of Bracamontes.

25

## 2. *Legal Principles*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citations.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

"Evidence that is identical in subject matter to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value. [Citation.]" (*People v. Mattson* (1990) 50 Cal.3d 826, 871.) However, the trial court may consider whether photographic evidence is cumulative as one factor in exercising its discretion whether to exclude the evidence under Evidence Code section 352. (*People v. Michaels* (2002) 28 Cal.4th 486, 532.)

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the

Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citation.]" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) However, " 'reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545 (*Brown*).) " '[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]" (*Id.* at pp. 545-546.)

### 3. *The Trial Court Did Not Err by Limiting the Photographic Evidence*

Bracamontes argues that Doe 3's testimony was the only substantial evidence offered to prove the charges that he molested her, such that the photos, by contradicting her testimony that she was always afraid of him, had a high probative value. The Attorney General contends the trial court did not abuse its discretion by excluding most of the 28 proffered photos because the six photos the court admitted were sufficient for the purposes of impeachment, and the excluded photos had little or no additional probative value.

The photos provided evidence suggesting that Doe 3's testimony concerning her fear of Bracamontes was inaccurate or unreliable, but that does not by itself establish their relevance to the facts of the charged offenses. The photos' relevance and probative

value depended on additional inferences to connect them with the elemental facts underlying the offenses. The primary theory of relevance argued by defense counsel was that the photos impeached the credibility of Doe 3's testimony and showed she was lying in her testimony concerning the sexual assaults.

During argument over the admissibility of the photos, defense counsel offered the photographs strictly for impeachment purposes. After the trial court admitted six of the photos, defense counsel in cross-examination presented Doe 3 with the photos and questioned her about how she appeared in them. Doe 3 agreed in her responses that she appeared to be happy and comfortable in Bracamontes's presence. When defense counsel confronted Doe 3 with her prior testimony to the effect that she was afraid of Bracamontes, she conceded, "That wasn't the entire truth." In closing argument, counsel argued the photos showed Doe 3 was lying when she testified she feared Bracamontes, and counsel further argued she was lying when she testified that he sexually assaulted her. The defense's theory was that Doe 3 and her siblings lied about being sexually assaulted because they were motivated by a desire to prevent Bracamontes from getting custodial rights.

On appeal, Bracamontes does not explain how, under that theory of relevance, the excluded photos could have provided additional probative value beyond the six that were admitted and used in cross-examination. Once counsel had impeached Doe 3's testimony with the with the six admitted photos, it would have been redundant and pointless to repeat the same line of cross-examination 22 more times using the remaining 22 photos. The trial court did not abuse its discretion by excluding those photos as cumulative and requiring an undue consumption of time.

The photos arguably could have had some probative value under a non-impeachment theory of relevance. Defense counsel could have argued the photos constituted evidence Doe 3 had not been molested because it would be inconsistent for a child to be happy and comfortable in the presence of an adult who had sexually assaulted

28

them.  But the probative value of the photos under this theory was weak because there was no evidence in the record to support the assumption that a child who had been molested would not be happy and comfortable in the presence of their molester.  Doe 3 plausibly testified to the contrary:  Having been shown photos of her appearing happy and comfortable in the presence of Bracamontes, Doe 3 reflected on the reasons for that and explained that, at the time it was happening, she did not realize that what he was doing was wrong:  "I didn't know what to think of it all.  So I loved my father, not knowing the real truth behind it all, that it was bad."

If any of the jurors had been disinclined to credit this testimony based on the assumption that a child who was being sexually abused was unlikely to be happy in the company of their abuser, the record includes evidence the jury could have relied on to dispel that assumption.  Dr. Blake Carmichael, a clinical psychologist who specialized in the study and treatment of child victims of sexual abuse, testified for the prosecution as an expert in Child Sexual Abuse Accommodation Syndrome.  Dr. Carmichael testified that it was a myth or misconception that child victims of sexual abuse will automatically try to avoid their abusers.  The child may not even recognize when their abuser is doing something inappropriate.  In describing how child victims may keep the fact of their abuse secret, Dr. Carmichael noted that child victims may enjoy spending time with their abuser even while the abuse is ongoing.  The child may even seek out their abuser for pleasurable and enjoyable interactions.

Bracamontes did not introduce any evidence to the contrary.  Accordingly, under this theory of relevance, the photos had little probative value as evidence that Doe 3 had not actually been abused.  Furthermore, as with the impeachment theory of relevance, Bracamontes does not explain how the remaining 22 photos, had they been admitted, could have provided any additional probative value beyond the six photos defense counsel used in cross-examination.  For example, defense counsel made no showing that any one of the excluded photos was taken soon after one of the alleged incidents of

29

abuse.  For that matter, defense counsel made no factual showings or proffers with respect to the timing any of the excluded photos that would logically make any particular photo more probative than any of the six photos that were admitted.

For the reasons above, we conclude the trial court did not abuse its discretion by excluding 22 of the 28 proffered photos under Evidence Code section 352.  For the same reasons, Bracamontes's claims of constitutional error are also without merit.  A trial court's "reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*Brown*, *supra*, 31 Cal.4th at p. 545.)  Bracamontes points to nothing in the record or the law that would transform this routine ruling under the California rules of evidence into a federal constitution violation.  He contends the trial court violated his rights to present a defense and confront a witness against him because "the court effectively denied the defense a means through which it might have shown the jury [Doe 3] was lying," but the court admitted six photos which defense counsel used precisely for that purpose.  Bracamontes does not explain how the exclusion of the remaining photos prevented him from implementing that strategy, much less how their exclusion violated his constitutional rights.  Accordingly, " 'we resolve defendant's multiple constitutional claims without separate discussion.  Rejection of a claim on its merits necessarily disposes of the additional constitutional "gloss." ' [Citation.]" (*People v. Scott* (2015) 61 Cal.4th 363, 394-395.)

### 4. *The Trial Court Did Not Err by Limiting the Testimony of a Character Witness*

Bracamontes introduced testimony from several character witnesses in his defense. His brother G.B. testified that he was Doe 3's godfather, and that he loved her.  G.B. generally saw Bracamontes on weekends when his children were present.  G.B. testified that the children seemed to be happy, and he had never seen Doe 3 appear scared or

uncomfortable when she was in Bracamontes's presence. G.B. saw Doe 3 hug Bracamontes "[a]ll the time," and G.B. had seen her act playfully in his presence. G.B. had never seen Bracamontes appear to do anything sexually inappropriate to any child in the prior 20 years. G.B. opined that Bracamontes was not the kind of man who would do anything sexually inappropriate to any child; that he loved his children; that he had a good heart; and that he was incapable of doing something to a child.

On cross-examination, the prosecutor asked G.B., "[W]hen Doe 3 reported what her dad did, that he touched her in a sexually inappropriate way, did you check on her to see how she was doing?" G.B. responded, "No." The prosecutor asked G.B. if he had checked on Doe 4 "to see how she was doing after the report came out," and G.B. again responded, "No." Defense counsel did not object.

During defense counsel's redirect examination of G.B., counsel requested a "sidebar" discussion and sought the trial court's permission to ask G.B. about why he had not contacted Doe 3. Defense counsel proffered that G.B. would respond that he did not reach out to Doe 3 and Doe 4 because "he was fearful of dealing with the mother [R.G.]." Counsel added, "There's a lot of bad blood between [G.B.] and R.G. And that [G.B.] did not expect that R.G. would let him talk to her children." The trial court ruled that the proffered testimony was excluded under Evidence Code section 352. The court referred to its prior ruling in response to in limine motions in which the court excluded "any character evidence with regard to [R.G.] and any information about her" under Evidence Code section 352.[9]

---

[9] The prosecutor moved in limine to exclude improper character evidence concerning R.G., but argument was focused on various other factual claims—e.g., the alleged custody dispute between R.G. and Bracamontes. The trial court stated it was inclined to exclude certain categories of evidence under Evidence Code section 352—e.g., evidence of R.G.'s alleged desire to obtain a "U visa"—but the court generally reserved ruling on the motion on the ground that foundational testimony might be adduced at trial. Neither party raised the facts or statements at issue here concerning

Bracamontes argues the trial court's ruling limiting his questioning of G.B. violated the Evidence Code and the constitutional right to present a defense. Bracamontes argues the prosecution, by eliciting an admission from G.B. that he had not checked on Doe 3, substantially undermined the credibility of G.B.'s opinion testimony. Bracamontes contends the trial court's ruling violated his right to rehabilitate the witness by adducing testimony from G.B. explaining his reasons for not checking on Doe 3, and that the ruling contravened Evidence Code section 352. Bracamontes characterizes G.B.'s proffered explanation as "highly probative" and Bracamontes argues that the introduction of such testimony would not have resulted in undue prejudice, confusion, or consumption of time.

The Attorney General argues the trial court did not abuse its discretion because the excluded evidence had little or no probative value. The Attorney General contends the closeness of G.B.'s relationship with Doe 3 was a collateral matter, and that his reason for not contacting Doe 3 was largely inconsequential given that G.B. did not believe Doe 3 had been abused. Furthermore, the Attorney General argues the excluded testimony presented a substantial risk of confusing the issues and consuming unnecessary time because it would have raised the question whether G.B.'s proffered explanation was accurate. The Attorney General further contends that any error under state law was harmless.

Even assuming the trial court erred by limiting G.B.'s testimony on redirect, we would conclude the error was harmless under the federal constitutional standard for prejudice as well as the state law standard. (See *Chapman v. California* (1967) 386 U.S. 18 [standard for prejudice is whether error was harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818 [standard for prejudice is whether a more favorable result would have been reasonably probable in the absence of error].) The

"bad blood" between R.G. and G.B.; his being fearful of R.G.; or his reasons for not approaching Doe 3.

entirety of the excluded testimony consisted of one or two statements by a character witness. In the context of the record as a whole, there was no reasonable probability of a more favorable outcome had the testimony been admitted, and the effect of excluding it was harmless beyond a reasonable doubt.

For the reasons above, we conclude these claims are without merit.

### C. *Sufficiency of the Evidence to Support a Third Conviction for Aggravated Sexual Assault*

Bracamontes contends the evidence was insufficient to support one of the three convictions for aggravated sexual assault charged in counts 1 through 3. He argues Doe 1 testified to facts sufficient to show Bracamontes sexually penetrated her with his fingers twice, but she testified that she did not know whether he did so a third time. Bracamontes further argues that based on the closeness of the evidence and the erroneous jury instruction based on CALCRIM No. 1191B, we must reverse all of his convictions. The Attorney General concedes the evidence was insufficient to support the third conviction for aggravated sexual assault, but he argues this only requires us to reverse the conviction on count 3.

For the reasons below, we conclude the Attorney General's concession is well-taken, but we reject Bracamontes's assertion that we must reverse all of his convictions.

### 1. *Legal Principles*

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, citing *People v. Maury* (2003) 30 Cal.4th 342, 403.) The record must disclose substantial evidence to support the verdict such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid.*) The substantial evidence must be reasonable, credible, and of solid value. (*Ibid.*) We review the evidence "in the light most favorable to the prosecution and presume in support of the

judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) "A reversal for insufficient evidence 'is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support' the jury's verdict." (*Ibid.*) The standard is the same under both the California Constitution and the federal Constitution. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)

Section 289, subdivision (a)(1)(A) prohibits "an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." Subdivision (k)(1) defines "sexual penetration" in relevant part as "the act of causing the penetration, however slight, of the genital or anal opening of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." This includes an act of penetration by using "any part of the body, except a sexual organ." (§ 289, subd. (k)(2).) Contact with the area inside the labia majora constitutes sexual penetration within the meaning of section 289. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1371 (*Quintana*).)

## 2. Procedural Background

Counts 1 through 3 charged Bracamontes with the aggravated sexual assault of "Jane Doe 1" by sexual penetration under section 289. The verdict forms for counts 1 and 2 specified the charged acts respectively as the first and second penetration of Doe 1's vagina when Bracamontes's sister was visiting from Mexico and Doe 1 was 10 to 12 years old. The verdict form for count 3 specified the act as "Another time with Doe 1 that occurred on or about and between October 4, 2005 and October 3, 2008," when Doe 1 was 10 to 12 years old.

As set forth above in section II.B.1, Doe 1 testified about an incident that occurred at a duplex where the family lived when she was around 10 or 11 years old. Bracamontes's sister was visiting from Mexico, and she lived with them for a while. In describing the incident, Doe 1 testified that Bracamontes alternated between touching her

breasts and touching her vagina for about 30 minutes.  She estimated that he probably switched between touching her breasts and vagina more than five times, and she testified that he touched her vagina with his hand skin-to-skin underneath her underwear.

The prosecutor asked Doe 1 whether any part of Bracamontes's hand went in between the lips of her vagina, and Doe 1 responded, "Yes."  The prosecutor asked whether any part of his hand went further into her vagina, and she responded, "Not inside, just in between."  The prosecutor then asked Doe 1 whether Bracamontes went in between the lips of her vagina on each of the five times or more than five times, and she responded, "I don't remember.  I know -- I know he did go in between my vagina."  The prosecutor asked if he did so at least two times, and Doe 1 responded, "Yeah." The prosecutor then asked if he did so at least three times, and Doe 1 responded, "I don't know."

Doe 1 subsequently testified that there were other occasions when Bracamontes touched her vagina, but she could not testify to any details about those times.

### 3.  *The Evidence Was Insufficient to Support a Conviction on Count 3*

Bracamontes argues this evidence was sufficient to prove two counts of sexual penetration but not a third count.  The Attorney General concedes this claim.  We conclude the concession is well-taken.  The parties agree that contact with the area inside or between the labia majora constitutes "sexual penetration" under section 289, and the case law supports this interpretation.  (*Quintana*, *supra*, 89 Cal.App.4th at p. 1371.)  Furthermore, a juror could reasonably interpret testimony that part of the defendant's hand went "in between the lips of [the] vagina" to mean the defendant made contact with the area inside the labia major, which constitutes sexual penetration under section 289.

Doe 1 testified that part of Bracamontes's hand went in between her vaginal lips at least twice, but when asked whether it happened at least three times, she responded, "I don't know."  She testified to other times when Bracamontes "touched [her] vagina," but she did not testify to any facts by which jurors could reasonably find the contact

35

constituted penetration as distinguished from contact with a strictly exterior part of the genitalia.[10]  She did not testify to any other facts that could reasonably be interpreted as another act of penetration, and we find no such evidence in any other portion of the record.  Accordingly, no rational juror could find Bracamontes committed a third act of sexual penetration against Doe 1.  Because the verdicts on counts 1 and 2 were specific to two acts of sexual penetration committed at a time and place consistent with Doe 1's testimony, while the verdict on count 3 pertained to an act committed at "Another time," we conclude the evidence was insufficient to support the conviction on count 3.

As to Bracamontes's assertion that we must reverse all his convictions, he offers no argument to support it.  He contends only that total reversal is required due to the "closeness of the case" and the trial court's instruction to the jury based on CALCRIM No. 1191B.  For the reasons set forth in section II.A, we have no legal ground to invalidate that jury instruction.  And Bracamontes makes no showing that the jury relied on its finding of guilt on count 3 as a basis for using the instruction to convict him on any other count.  Absent such a showing, we perceive no other logical connection between the instruction and the evidence pertaining to the aggravated assault charges that would justify reversal of all the convictions.

Accordingly, we will reverse the conviction on count 3 only.

---

[10] The anatomically accurate definition of "vagina" refers to the muscular tube of tissue descending from the cervix to the vaginal opening between the labia minor.  (See Nguyen J.D., Duong H., (2023) "Anatomy, Abdomen and Pelvis: Female External Genitalia" available at: < https://www.ncbi.nlm.nih.gov/books/NBK547703/ > [as of June 26, 2024], archived at < https://perma.cc/DJC2-MVRN >.)  It is unlikely a person's hand would contact the vagina without penetrating the genital opening under section 289 as construed by *Quintana*.  However, in the context of the complaining witness's testimony, it appears she understood the term "vagina" in accordance with colloquial usage—i.e., to mean the general area of the vulva including the external portions—by which touching the "vagina" would not necessarily constitute penetration under section 289 as construed by *Quintana*.

36

### D. *Remaining Claims*

Bracamontes raises three additional claims, but we conclude they are either mooted or foreclosed by our rulings above. Bracamontes contends the trial court erroneously instructed the jury on the requirement of unanimity with respect to the third charge of aggravated sexual assault in count 3. The Attorney General contends this claim is moot if we conclude the conviction on count 3 must be reversed for insufficiency of the evidence. We agree. Because we conclude in section II.C that the conviction on count 3 must be reversed based on the insufficiency of the evidence supporting it, we need not reach this claim.

Bracamontes further contends the cumulative impact of prejudice from multiple errors requires reversal of all his convictions. As set forth above, we conclude the trial court did not err by instructing the jury based on CALCRIM No. 1191B, and the court did not abuse its discretion by excluding certain photographs. We conclude the trial court's limiting of a character witness's testimony was harmless even assuming it was erroneous, but absent multiple errors, there is no other prejudice to cumulate.

Finally, Bracamontes contends that if we reverse all the convictions against two of the three victims, we must also vacate the enhancements based on the multiple-victim allegations. Because we only reverse one conviction, leaving intact the remaining convictions as to all three victims, we need not address this claim.

### III.    DISPOSITION

The judgment of conviction on count 3 is reversed. The sentence is vacated and the matter is remanded to the trial court for resentencing. On remand, the trial court shall correct the abstract of judgment to show the court imposed a concurrent term on count 4 and a consecutive term on count 14.

_____

Greenwood, P. J.

WE CONCUR:

_____

Grover, J.

_____

Lie, J.

H048925
People v. Bracamontes